[No. D001320. Fourth Dist., Div. One. Apr. 15, 1985.]

In re JAMES B., a Minor.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
VIRGINIA B. et al., Objectors and Appellants.

COUNSEL

Michele Sacks Lowenstein and Leahy & Lowenstein for Objectors and Appellants.

Edwin L. Miller, Jr., District Attorney, Peter C. Lehman and Edward J. Mantyla, Deputy District Attorneys, for Petitioner and Respondent.

OPINION

WIENER, J.—The order declaring James B. (Jimmy) a minor of the juvenile court under Welfare and Institutions Code section 300, subdivision (d)[1] and removing him from the custody of his parents Virginia and James B. arose out of his near death condition when his parents presented him for care at Balboa Naval Hospital where he underwent emergency surgery for a subdural hematoma. His parents appeal the order. We affirm.

*Factual and Procedural Background*

The focus of the issues at trial and also on appeal is the cause of Jimmy's critical condition. The parents, Virginia and James, testified Jimmy fell out of bed approximately 40 to 45 hours before he fell into a coma. They testified this fall was aggravated by a second fall from a height of approximately 24 inches off a couch one hour before Jimmy arrived at the hospital. His parents offered the expert testimony of a pediatrics neurologist that Jimmy's condition could have been caused by a fall from his bed. The San Diego County Department of Social Services offered expert testimony that Jimmy's condition could not have been caused by such a fall. They also relied upon reports submitted by other doctors and the child abuse committee which supported the testimony of their expert.

*Discussion*

Social worker Karen Davis filed a dependent child petition under section 300, subdivision (d) alleging Jimmy's home was unfit. The petition further

---

[1]All subsequent statutory references are to the Welfare and Institutions Code.

alleged under section 355.2 that Jimmy's medical condition ordinarily would not occur except as the result of unreasonable and/or neglectful acts or omissions on the part of his parents.

The judge relied on section 355.2 in reaching his disposition of the case. Section 355.2 provides: "Where the court finds, based upon competent professional evidence, that an injury . . . sustained by a minor, of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, [or] guardian, . . . such evidence shall be prima facie evidence that the minor's home is an unfit place . . . and such proof shall be sufficient to support a finding that the minor is described by subdivision (d) of Section 300." ▮ The judge interpreted the statute to relieve him of making findings of fact as to how Jimmy's injury actually occurred and whether his home was unfit. We conclude the judge misinterpreted and misapplied the statute.

Section 355.2 is a rebuttable presumption.[2] As such, it requires the mandatory inference of a presumed fact unless rebuttal evidence is offered. Section 355.2 is a somewhat unusual presumption in that it actually involves two presumed facts. The first requires the court to presume a child's injury actually occurred by injury or neglect when the court finds the injury is of the sort which ordinarily would not occur except by abuse or neglect. The second permits the court to presume that, given such an injury, the child's home is unfit. The presumption only survives, however, until the parents or guardian(s) present rebuttal evidence as to either or both presumed facts. Where rebuttal evidence is offered, the presumption in no way relieves the court of its obligation to make factual findings as to the cause of the injury and the fitness of the home.

In this case, Jimmy's parents presented rebuttal evidence on both presumed facts.[3] At the conclusion of the hearing, the court made the finding Jimmy's injury ordinarily would not have occurred absent neglect or abuse. The court explicitly refrained from finding, however, how the injury ac-

---

[2]Section 355.6 designates the presumptions created by section 355.2 as one affecting the burden of producing evidence rather than the burden of proof. As such, it merely shifts to the parents the obligation of raising an issue as to the actual cause of the injury or the fitness of the home. If rebuttal evidence on either issue is offered, the county maintains the burden of proving the initially prepared facts by clear and convincing evidence.

[3]As to the first presumed fact, both of Jimmy's parents testified Jimmy's injuries resulted from the fall from his bed aggravated by his subsequent fall from the couch. A family friend who was a house guest at the time verified Jimmy's fall from bed. The expert who testified on behalf of Jimmy's parents gave his opinion Jimmy's condition could have been caused by a fall from bed. As to the second presumed fact, both parents and another family friend testified to the fitness of Jimmy's home.

tually occurred and whether Jimmy's home was unfit.[4] The court thus erred, in effect treating section 355.2 as a conclusive rather than rebuttable presumption.

■ Ordinarily a court's misapplication of a presumption would require reversal of the case. Here, however, the evidence is so clear Jimmy's home was unfit for him at the time, we believe no reasonable judge could have come to a different conclusion. For this reason we find the error harmless.

Included in the record on the appeal is the social study prepared by social worker Karen Davis. Attached to that report is a copy of the child abuse committee medical statement signed by Dr. J. A. Schneider. Also attached is a report by pediatrician Dr. John E. Schanberger based on his consultation with Jimmy. The record also includes a supplemental social study prepared by the same social worker which includes references to comments about Jimmy's home by Jimmy's aunt, and references to a report on Jimmy and his home by psychologist Dr. Stewart Ludwig. From these documents we extract the following evidence considered by the judge. Dr. Schneider described Jimmy's case as a "*clear-cut* case of non-accidental trauma of [an] abusive nature." Dr. Schanberger, called by Virginia and asked to examine her child and give an opinion as to whether the injury could have occurred from a fall from a couch, opined it could not. He also stated it was his opinion Jimmy would be at high risk if returned to his present home setting. Jimmy's maternal aunt made it clear to the social worker she did not approve of the child care provided in the parent's home. Dr. Ludwig, who saw Jimmy and his three and one-half-year-old twin brother and sister on three occasions and who also had multiple appointments with the parents, the parent's psychologist, and foster parents, found all three minors were not progressing at normal rates of development despite their demonstrable ability to learn. He opined the developmental delay appeared to be environmental. He described Virginia's response to her children as inconsistent and inadequate and noted James did not always act appropriately with adults.[5] It was his opinion Jimmy should remain outside of his home at the time. It was the unanimous opinion of the child abuse team that examined Jimmy's

---

[4]The court made the following comments: ". . . ordinarily this is not the sort of injury which would occur without, . . . unreasonable or neglectful acts . . . I guess what the Legislature means to say is that we're going to err on the side of protecting the child and that I'm supposed to find whether there's clear and convincing evidence that ordinarily it wouldn't have happened. . . . [¶] I'm going to make true findings . . . based upon that presumption. . . . But I don't want anybody to think that I'm finding that anybody went and shook this kid, because I'm not finding [that].

[5]Dr. Schneider informed the social worker that the physician on the ship on which James was stationed reported James was seen banging his head against walls and appeared to have ideation. In June 1983 the ship's physician recommended he have psychiatric evaluations and care.

records that Jimmy's injury was nonaccidental. It was the opinion of social worker Karen Davis who prepared the social studies on Jimmy that Jimmy should be under court protection and out of his home at the time.

Dr. Thomas Lohner, Director of the Division of Adolescent Medicine at the San Diego Naval Hospital, Chairman of the Command's Child Abuse and Neglect Committee, and Chairman of the San Diego Child Abuse Coordinating Council testified he examined Jimmy, his X-rays, and his medical records and found Jimmy had an acute right frontal subdural hematoma. Dr. Lohner testified in order for such an injury to be caused by a fall, a minimum vertical fall of six to eight feet onto one's head on a hard surface would be required. He also stated a skull fracture would accompany the subdural hemotoma in the vast majority of cases. Jimmy had no skull fractures. Dr. Lohner testified the commonest way children get massive subdural hemotomas in brief periods of time without any fractures is from very violent shaking. He testified that was the most likely explanation of Jimmy's injuries. He was emphatic in stating his opinion that a fall from a bed followed by a fall from a couch could not have caused Jimmy's injuries. The blood clot found in Jimmy's brain was a large blood clot of 100 cc.'s of fresh blood yet there was no record of any bump, soft tissue injury, swelling or discoloration of the scalp. He testified the doctors who initially treated Jimmy would not be likely to miss such a bump unless they saw the child within minutes of the injury. He noted two areas of hemorrhage in Jimmy's left eye of the sort that accompany shaking injuries in the vast majority of cases. He noted such hemorrhage are more common with shaking than with falls. It was Dr. Lohner's opinion that the degree of force or violence required to cause the kind of injury Jimmy had would be equivalent to that of throwing a child through the windshield of an automobile. He completely dismissed the literature on spontaneous subdural hemotomas or hemotomas caused by minor head injuries discussed by Jimmy's parents' expert. In his words, "children do not get subdural hematoma from falling from beds or falling from couches or any normal childhood activities."

While Jimmy's parents' expert, a pediatrics neurologist, testified Jimmy's injury theoretically could have occurred under the circumstances his parents described, he did not testify that Jimmy's injury in fact did occur in this manner. The above evidence is more than sufficient to justify the conclusion Jimmy's injury was caused by the neglect and/or abuse of his parents.

Given Dr. Lohner's description of how a subdural hemotoma of the magnitude and nature Jimmy suffered would likely occur, and given our conclusion Jimmy's injury did in fact occur in this manner, we feel Jimmy's home was unfit for him at the time. Jimmy's mother admitted to the social worker that Jimmy, in addition to the twins, was often too much for her. The court

had before it a six-page psychological evaluation prepared by Dr. Ludwig and another doctor which the court described as forceful and portending some rather significant difficulty with these children. The court stated that although the psychiatric report focused on the twins it dealt with broader issues, in particular family dynamics and problems. Under these circumstances, any error which occurred is harmless.

*Disposition*

Order affirmed.

Brown (Gerald), P. J., and Work, J., concurred.