207 Cal.App.3d 504 (1989)
254 Cal. Rptr. 883
In re JESSICA B., a Person Coming Under the Juvenile Court Law.
KINGS COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
GINGER B. et al., Defendants and Appellants.
Docket No. F009501.
Court of Appeals of California, Fifth District.
January 25, 1989.
*507 COUNSEL
Marsha Perkes, under appointment by the Court of Appeal, and Joel M. Basta for Defendants and Appellants.
John K. Van de Kamp, Attorney General, Charlton G. Holland, Assistant Attorney General, and Elisabeth C. Brandt, Deputy Attorney General, for Plaintiff and Respondent.
Richard B. Barron, under appointment by the Court of Appeal, for Minor.
[Opinion certified for partial publication.[*]]
OPINION
HAMLIN, J.
Both the mother, Ginger B. (Ginger), and the father, William B. (William), of Jessica B., a minor previously declared a dependent *508 child of the juvenile court under Welfare and Institutions Code section 300, subdivisions (a) and (d), appeal from an order filed November 12, 1987, on a six-month review hearing. In particular, Ginger and William (jointly referred to as appellants) challenge that part of the court's order that denied William the right to be in the same home with Ginger and Jessica except under visitation supervised by the Kings County Department of Social Services (the Department). This denial was contrary to the reunification plan recommended by the Department.
Appellants advance multiple grounds for reversal, including the lack of: (1) the required jurisdictional findings; (2) independent and effective counsel for the minor; and (3) any credible evidence upon which to deny reunification. For reasons we will explain, we conclude that none of appellants' contentions require reversal and affirm the order on review.

THE FACTS AND PROCEDURES IN THE JUVENILE COURT
During the afternoon of December 5, 1986, William was caring for his eight-month-old daughter, Jessica. He called his wife Ginger to come home because something was wrong with Jessica. Ginger came home, and together they rushed Jessica to Lemoore Naval Hospital.
Upon arrival at the hospital, Dr. David Rodriguez, the head of pediatrics, assessed Jessica's condition as critical and began life-saving measures. Emergency personnel questioned the parents and were told that Jessica had strangled on a crib toy. After stabilizing Jessica, Dr. Rodriguez questioned William about Jessica's injuries. William again related that Jessica had a crib toy wrapped around her neck and had stopped breathing. Dr. Rodriguez reexamined Jessica and found no evidence of a rope having been tied around her neck. Her neurological condition was worse than what would have been caused by strangulation. Dr. Rodriguez suspected there had been head trauma.
Because of the severity of her condition, Jessica was transferred to Valley Children's Hospital in Fresno. Jessica was comatose when she arrived there, having sustained life-threatening injuries. Dr. H. Terry Hutchison spoke to appellants, who again stated that Jessica had strangled on a crib toy. Dr. Hutchison determined that the injury was not consistent with this story.
X-rays revealed that Jessica had a skull fracture that was causing her brain to swell. This led to surgery to remove part of Jessica's skull so her brain could expand.
Child abuse was suspected, and police officers were called to the hospital. William told Officer Morrell, in the presence of Ginger, that he had taken a bath with Jessica. When he was getting out of the bathtub, Jessica kicked *509 him and he lost his balance. He dropped her to the floor and fell on top of her. Dr. Hutchison found this story unlikely because of the lack of bruising in certain areas on Jessica. Also, the injury could not have been self-inflicted.
A dependency petition was filed December 9, 1986, against appellants. It alleged that Jessica was a person coming within the provisions of Welfare and Institutions Code section 300, subdivisions (a) and (d), because her home was an unfit place for her by reason of cruelty and physical abuse, she was in need of proper and effective control, and she had no parent or guardian exercising such care and control.[1] A detention hearing was held on December 10, 1986, and the minor was detained.
A first amended petition was filed adding an allegation that Jessica was under the age of three when she sustained severe physical abuse. A jurisdictional hearing was held on December 22, 1986. The matter was continued as to Ginger, but William entered a no-contest plea to the petition as amended. The court found the admission to be freely and voluntarily made. The court stated that counsel had agreed to submit the factual basis for the admission on the report of the Department, which was to be prepared for the next hearing. Counsel confirmed such an agreement.
Numerous continuances were granted. A second amended petition was filed on March 3, 1987, as to Ginger only. It alleged that Jessica was a person within the provisions of section 300, subdivision (d). On March 4, 1987, it was agreed that the court could read the preliminary hearing transcript in the criminal child abuse case against appellants in making its jurisdictional finding against Ginger. On March 12, 1987, the court found the petition to be true.
Again the matter was continued many times. Upon Jessica's release from the hospital in March, she was placed in Ginger's custody. William could only have supervised visits with Jessica. On April 23, 1987, a dispositional hearing for appellants was held. At that time Ginger stated an interest in separating from her husband and returning to Virginia with Jessica to live with her family. The court ordered that Jessica remain a dependent of the court, that she continue to be released to Ginger under the Department's supervision, that a case plan be initiated, and that William was to have no visitation without a social worker present. The Department was asked to initiate proceedings through interstate compact to have the State of Virginia take over the supervision of Jessica. The court further ordered that a case plan be prepared and psychological therapy and treatment be made available to appellants. A review was set for June 30, 1987.
*510 The Department prepared and filed with the court on June 30 a supplemental report and recommendation. The report indicated that Ginger no longer desired to return to Virginia but had chosen to remain in Kings County with William. The service plan had several objectives, including that William accept responsibility for Jessica's injuries and Ginger develop independence.
A review hearing was held on June 30, 1987. At that hearing the district attorney asked to be relieved as counsel for the Department because he did not concur with the Department's recommendation that reunification be made.
The court requested authorities on relieving the district attorney from representing the Department. The district attorney reiterated that at this point he felt there was a conflict between Jessica and the Department. The court then made an order identical to the order made on April 23, 1987. The next hearing was set for October 22, 1987.
During the interim, several reports were prepared evaluating Ginger and William. On October 19, 1987, a hearing was held, and the district attorney indicated he felt it would be in the best interests of Jessica if she had independent counsel at that point. The court asked the district attorney, "do you feel that you cannot represent Jessica's interest and represent the Department of Social Services at this time?" The district attorney responded affirmatively.
On October 27, 1987, the continued review hearing was held. Michael Woodbury, a former member of the district attorney's office, was present representing Jessica. William's attorney questioned whether Woodbury would have a conflict because he had been an active member of the district attorney's office during criminal proceedings in William's case. Woodbury indicated he had not personally handled the case. The court found no conflict.
The court then asked Jessica's counsel if he was ready to proceed. He gave an equivocal answer, but the hearing was held.
Separate counsel for appellants each argued that the court should follow the recommendation of the Department and allow William to return to live with Ginger and Jessica.
The court then expressed its dissatisfaction with the psychiatrist's report on which the recommendation was based.
Counsel for the minor argued that even though attendance at programs and therapy had been good, the underlying problem that produced the injury had not been addressed. Reunification cannot occur, he asserted, *511 until William admits he abused Jessica and works through appropriate remorseful feelings concerning those actions.
After reiterating its dissatisfaction with the psychiatrist's report, the court ruled that it would not follow the Department's recommendation, that reunification should continue and that William not be in the same home with Jessica except under circumstances of supervised visitation by the Department. One of the court's primary concerns was that William had not acknowledged his wrongdoing and grasped the problem. It therefore found that Jessica would be in danger if William were allowed to return to the home. This appeal followed.

DISCUSSION

I., II.[*]
.... .... .... .... .... .

III. Was it error for the district attorney to continue to represent the Department after disqualifying himself from representing Jessica?

(1a) Ginger asserts that at the time the district attorney recognized the conflict of interest between the Department and Jessica he should have recused or disqualified himself from representing either. Ginger contends that it is improper to continue to represent a client against a former client's interests.
The rule requiring that an attorney disqualify himself or be disqualified because he is representing the client with interests adverse to a former client is founded on two interests. The first is the interest in protecting confidential information obtained in the former attorney-client relationship. The second is the interest in protecting the confidence clients repose in an attorney in an established relationship that goes beyond the disclosure of confidences and into the mechanics of the relationship itself. (Civil Service Com. v. Superior Court (1984) 163 Cal. App.3d 70, 79-81 [209 Cal. Rptr. 159]; Industrial Indem. Co. v. Great American Ins. Co. (1977) 73 Cal. App.3d 529, 536, fn. 5 [140 Cal. Rptr. 806].)
Ginger relies on Earl Scheib, Inc. v. Superior Court (1967) 253 Cal. App.2d 703 [61 Cal. Rptr. 386] to support her position. (2) In Earl Scheib the court stated that the rule underlying its decision was that the attorney has a duty to preserve confidences of his client. (Id. at p. 707.) The *512 question is whether the former client has been prejudiced. (Ibid.) Citing Weidekind v. Water Co. (1887) 74 Cal. 386 [19 P. 173], the court concluded that if conflicting interests are shown, injury to the former client is presumed. Weidekind found that injury was presumed based upon a client's right that confidential communications not be disclosed. (Id. at pp. 387-389.) This rule continues today as stated by this court in Elliott v. McFarland Unified School Dist. (1985) 165 Cal. App.3d 562 [211 Cal. Rptr. 802].
"Case law interpreting what is `confidential information' initially asks whether the former representation is substantially related to the current representation. [Citations.] Where the substantial relationship exists, especially where the relationship is such that confidential information would normally have been imparted to the attorney, a `rule of necessity' causes a presumption of conflict." (165 Cal. App.3d at p. 568, fn. omitted; see also River West, Inc. v. Nickel (1987) 188 Cal. App.3d 1297, 1308 [234 Cal. Rptr. 33].)
(3) "Before an attorney may be disqualified from representing a party in litigation because his representation of that party is adverse to the interest of a current or former client, it must first be established that the party seeking the attorney's disqualification was or is `represented' by the attorney in a manner giving rise to an attorney-client relationship." (Civil Service Com. v. Superior Court, supra, 163 Cal. App.3d 70, 76-77.)
(1b) The instant case presents a unique situation not normally present in most conflicting representation cases. Because the former client here is a brain-damaged infant unable to effectively communicate with her attorney, it is absolutely clear that no confidential communications passed from client to attorney. Thus, the reason for the rule presuming prejudice is nonexistent. For the same reason, there could not possibly have been any rapport between Jessica and the district attorney. Thus, the fact that the district attorney continued to represent the Department when he had formerly represented Jessica could not have resulted in prejudice to her.

IV. Does the mother have standing to object to the district attorney's continued representation of the Department?

(4) Ginger asserts that the district attorney should have disqualified himself from representing the Department because his view differed from its view and thus he could not zealously represent it. In essence Ginger is arguing that the Department was denied the effective assistance of counsel.
Although it is established that a parent can raise issues regarding his or her child's right to counsel (In re Patricia E. (1985) 174 Cal. App.3d 1, 6-7 [219 Cal. Rptr. 783]), there is no authority that a parent has standing to claim that the Department received ineffective assistance of counsel.
*513 It is not required that the department of social services be represented by counsel. Such representation is only required when the parents are represented by counsel and the juvenile court requests the presence of the district attorney. (See present § 318.5, formerly §§ 351 and 318.) The juvenile court judge did not request such representation here. Thus, the Department had neither a statutory nor constitutional right to effective counsel in the dependency proceedings. If there is no right to counsel, then there is no right to effective counsel. If the Department cannot raise the issue, then clearly neither can Ginger. Assuming for the sake of argument that Ginger had standing to challenge aspects of the proceedings affecting the Department's rights, this does not change the outcome of the case. The Department continued to assert a position in conflict with the district attorney's views. The court considered the Department's position. Thus, there could have been no prejudice.

V.[*]
.... .... .... .... .... .

VI. Was there substantial evidence to support the finding that return of Jessica to William would be detrimental to her physical well-being?

In In re Cheryl H. (1984) 153 Cal. App.3d 1098, 1132 [200 Cal. Rptr. 789], the court explained the scope of our review on appeal. (5) It stated: "It is well settled that our review on this issue is limited to whether the judgment is supported by substantial evidence. Issues of fact and credibility are questions for the trial court, not this court. [Citation.] `The rule is clear that the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' [Citation.]"
Section 366.2 establishes the procedure for the court to follow at status review hearings: "(e) ... The court shall order the return of the minor to the physical custody of his or her parents or guardians unless, by a preponderance of the evidence, it finds that the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor. The probation department shall have the burden of establishing that detriment. The failure of the parent or guardian to participate regularly in any court-ordered treatment programs shall constitute prima facie evidence that return would be detrimental. In making its determination, the court shall review the probation officer's report and shall consider the efforts or progress, or both, demonstrated by the parent or guardian and the extent to *514 which he or she cooperated and availed himself or herself of services provided; shall make appropriate findings; and where relevant, shall order any additional services reasonably believed to facilitate the return of the minor to the custody of his or her parent or guardian...."
At the October 27, 1987, review hearing, following presentation of the arguments of the parents, the court expressed its dissatisfaction with the report prepared by the psychiatrist, Dr. Frank W. Kleist. In this context, the court stated: "THE COURT: Of course, the recommendation  it appears to me to be based largely on Dr. Kleist's report. It's very evident from reading Dr. Kleist's report that he doesn't even understand what the problem is. The problem is we have a little child that the Court has a responsibility to protect.
"We have a father who has physically abused that child; who has intentionally injured the child; who has been convicted of a crime of doing so; who has plead [sic] no contest to those related allegations in this Court and Dr. Kleist treats the whole matter as an accident and adopts Mr. [B.'s] version of the facts."
Counsel for the minor then argued that the report was based on the faulty premise because it did not address the real problem of deliberate physical abuse of the child.
The court refused to send the matter back to Dr. Kleist because it had no confidence in him. Ginger then posited that another report was necessary because there would be nothing before the court concerning the psychological problems and the issues. The court stated: "THE COURT: Sure we do. We have evidence that Mr. [B.] hasn't grasped the problem; hasn't admitted to himself that there even is a problem.
"We have evidence that Mrs. [B.] considers Mr. [B.] to be free from fault; that she doesn't believe he did anything. We have evidence that she is the type of person who would find it very difficult to oppose Mr. [B.]
"The Court gleans from that that this child is in extreme danger if Mr. [B.] is back in the household."
Ginger then argued that she had gone through every procedure that the law requires, and what more could she do? To this, the court responded: THE COURT: We can ask for a little bit of intellectual honesty from the parents of the child.
"The Court will not follow the recommendation. Reunification is ordered to continue and Mr. [B.] is not to be in the same home except under circumstances of supervised visitation by the Department of Social Services."
*515 (6a) Ginger, William, and the minor all assert that the evidence is insufficient to support the court's findings. They argue that: (1) appellants faithfully complied with all court-ordered programs; (2) the reports indicated that appellants were good and nurturing parents; and (3) the court could not base its findings on the criminal conviction. They conclude that the issue is not whether William intentionally abused Jessica but whether there would be any risk to her if he returned to the home.
There is no disagreement that appellants attended and participated in parenting classes and therapy. In fact, it appears that their participation in these programs is far better than normally expected. It is also undisputed that appellants demonstrated appropriate parenting techniques and were very nurturing to their child during supervised visits, especially in light of the fact that Jessica is brain damaged and requires special attention.
On the other hand, although Ginger has progressed, there is still evidence of dependent features that are seen in her relationship with William. "[H]er judgment is likely to be influenced by her husband, who occupies a more dominant role, which she seems to yield to." She is immature and dependent. Her unquestioned loyalty to William may interfere with detection and reporting if reabuse arises. She is submissive and he is dominant. Although those who made the above findings also concluded that Ginger's dependency was not a risk and was not a substantial detriment to reunification, it is ultimately the trial court's duty to make this determination based on the facts. Child abuse "may involve a failure to protect the child from harm caused by others." (In re Angelia P. (1981) 28 Cal.3d 908, 924 [171 Cal. Rptr. 637 [623 P.2d 198].) The trial court's finding that Ginger would not oppose William is supported by the evidence.
(7) The parties' assertions that the trial court inappropriately relied heavily upon William's criminal conviction that is not yet final is not convincing.
This court in In re Sonia G. (1984) 158 Cal. App.3d 18 [204 Cal. Rptr. 498] held that the term "convicted" as used in Civil Code, section 232, subdivision (a)(4) is limited in application to a final judgment. (Id. at p. 24.) "A judgment which is not yet final and may be reversed on appeal falls far short of the requirement of proof by clear and convincing evidence necessary to permanently sever a parental relationship." (Id. at p. 23.)
In In re L.S. (1987) 189 Cal. App.3d 407 [234 Cal. Rptr. 508] this court reversed the upholding of a section 300, subdivision (d), petition that was based solely on the father's conviction then on appeal. (Id. at p. 409.) That opinion expressly states that it was confined to the unique circumstances of that case. (Ibid.) The court intimated that a nonfinal conviction may have some remote evidentiary value. (Id. at p. 414.)
*516 (6b) The instant case is clearly distinguishable from In re L.S. The court here had before it the preliminary hearing transcript that contained testimony of the physicians who treated Jessica. It also had doctors' reports contained within the social workers' reports. This evidence amply supported the court's belief that Jessica's injuries were intentionally inflicted by William. Furthermore, the court appears to have placed no reliance on the criminal conviction whatsoever. It mentioned the conviction only as one of four reasons why it felt Dr. Kleist's report was made on a faulty premise. It never mentioned the conviction again. There was substantial evidence to support the court's conclusion that William intentionally abused Jessica and inflicted severe injuries upon her.
Finally, the court's conclusion that William's return to the home would create a substantial risk of detriment because William had refused to acknowledge his wrongdoing and grasp the problem is supported by the evidence. Section 366.2 "requires the court to consider the efforts and progress or both, demonstrated by the parent and the extent to which he or she cooperated and availed himself or herself of the services provided." (In re Venita L. (1987) 191 Cal. App.3d 1229, 1241 [236 Cal. Rptr. 859].) The report of licensed clinical social worker Deborah Prast hit the nail on the head. She stated that if one believes William that the incident was an accident, then no therapy is indicated. If, on the other hand, one believes that William intentionally injured Jessica, then reunification cannot occur until William admits abuse and works through appropriate remorseful feelings. Traditional treatment is of limited value until the abuse is admitted.
Ms. Prast's evaluation of the situation is not unique and is supported by others. For example, in a report issued in 1986 by the State of California Health and Welfare Agency, Department of Social Services, entitled "The California Child Abuse Reporting Law: Issues and Answers for Professionals," in a discussion concerning helpful intervention, the following statement is made: "Facing Denial: It is common for abusive parents to deny that they have been abusive. This is to be expected. They have a great deal to protect and they are usually feeling judged and exposed. The author has found it helpful to initially expect and ignore the denial, and proceed with the therapy as if an admission had just been obtained. In other words, if the admission is not forthcoming immediately, I find it best to proceed beyond the `who done it?' stage, focusing on assessment of the individual's strengths, weaknesses, and concerns based on my understanding of the underlying family dynamics.
"If the denial persists past a set time frame (usually 4-6 months) the prognosis becomes more bleak. It is essential for the therapist to create a safe, trusting environment conducive to self-disclosure, while consistently raising the issue of denial.
*517 "The therapist is not the long arm of the law, particularly regarding investigation. While the therapist can use the legal system effectively and cooperatively, it is not the therapist's job to prove culpability or collect evidence.
"Some clients will never admit to the abuse, and therefore make the possibility of obtaining therapeutic help minimal." (The Cal. Child Abuse Reporting Law: Issues and Answers for Professionals, supra, at p. 19; see also Edwards & Gil, Breaking the Cycle (1986) pp. 147-148; Jones, The Untreatable Family (1987) 11 Child Abuse & Neglect 409.)
As previously set forth, there was substantial evidence that William intentionally abused Jessica. This finding dictates the conclusion that there was substantial evidence to support the court's conclusion that there had been no progress on the part of William in alleviating the problem that brought Jessica under the protection of the juvenile court. William's failure to admit fault indicates that he is neither cooperating nor availing himself of the services provided.
The evidence was substantial that William intentionally abused Jessica; that Ginger is a dependent type of person who might not intervene and stop further abuse; and that William, because of his failure to admit his acts, has received no therapy that will alleviate the initial presenting problem. The combination of these three factors supported the court's finding that the return of William to the home of Ginger and Jessica would create a substantial risk of detriment to the physical well-being of Jessica.

VII. Does the requirement of the court that William admit that he intentionally abused Jessica and seek treatment based on such an admission violate the right against self-incrimination and due process?

As previously set forth, there was substantial evidence to support the court's conclusion that there had been no progress on the part of William in alleviating the problem that brought Jessica under the protection of the juvenile court. Until William admits that he is at fault, the court is unwilling to allow him to return home. Obviously, the admission demanded of William by the court that he intentionally abused Jessica would entail William incriminating himself. At first blush, this would appear not to be a problem because section 355.1, subdivision (d), provides: "(d) Testimony by a parent, guardian or other person who has the care or custody of the minor made the subject of a proceeding under Section 300 shall not be admissible as evidence in any other action or proceeding."[4] Thus, William can testify in the juvenile court dependency proceedings that he intentionally injured Jessica and his privilege against self-incrimination would be statutorily *518 protected. The testimony could not be utilized in criminal proceedings. But, the court requires more of him than just his personal admission. It also requires that William receive treatment after his admission aimed at dealing with the problem that caused him to injure Jessica. This would, of course, entail preparation of and presentation to the court of reports by the persons involved in William's therapy.
(8) Strictly speaking, testimony is only "that evidence which comes from living witnesses who testify orally." (Mann v. Higgins (1890) 83 Cal. 66, 69 [23 P. 206].) The reports could not be testimony in the strict sense of the word and would not be subject to the statutory protection of section 355.1, subdivision (d), unless "testimony" as used in that section is construed to encompass not only statements in court but also evidence based on any statements by a parent, guardian or other person who has the care or custody of the minor. "Evidence" is a more comprehensive word and includes testimony. However, "in common language, and sometimes even among lawyers, the two words are frequently used synonymously." (Id. at p. 69.) In light of Mann v. Higgins, supra, which set forth the precise definition of testimony many years before this statute was enacted, and in light of Evidence Code section 140 which defines evidence to mean "testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact," it is doubtful that the legislators were unaware of the strict definition given to the word "testimony." If they had intended that a more expanded meaning apply, it can be argued they simply would have used the word "evidence." Furthermore, section 355.1, subdivision (d), was originally enacted as part of the legislation which provided that there is prima facie evidence that a child is a person described in section 300 once it is shown that the injuries sustained by the child would not ordinarily be sustained except as the result of the unreasonable or negligent acts or omissions of either parent. Based on this rebuttable presumption, the burden of producing evidence then shifts to the parent. Thus, the parents are required to raise evidence as to the actual cause of injury or fitness of the home. (See In re James B. (1985) 166 Cal. App.3d 934, 937 [212 Cal. Rptr. 778].) It was thought that the provision which was added making "testimony" of the parents inadmissible in other court proceedings would encourage testimony from the parent. Therefore, even though a more expanded definition of testimony to include all statements, in or out of court, is more consistent with the policy of the statute "that all relevant evidence should be disclosed in proceedings of this nature in order to protect the paramount interest of the safety and welfare of the child" (Collins v. Superior Court (1977) 74 Cal. App.3d 47, 54 [141 Cal. Rptr. 273]), it is clear this is not what was intended when this provision was added. (9) Our holding that the immunity provided by section 355.1, subdivision (d), is limited to statements of the parent in court, i.e., *519 "testimony" in the strict sense of the word, does not mean that nothing need be done to relieve a parent of the unpalatable alternatives available to him or her under the circumstances of this case.[5]
In Ramona R. v. Superior Court (1985) 37 Cal.3d 802 [210 Cal. Rptr. 204 [693 P.2d 789], 17-year-old Ramona was charged with murder. A fitness hearing was held to determine if she should be tried as an adult. She refused to testify at the fitness hearing because the trial court would not grant her immunity from use at trial of any statement she made in the fitness hearing or to her probation officer. She filed a petition for a writ of mandate contending this was error. (Id. at pp. 804-805.)
Prior to the passage of article I, section 28, subdivision (d) of the California Constitution (Prop. 8), case law had established that "statements made by a minor to a probation officer and to a court in a fitness hearing could not be introduced as substantive evidence against the minor at trial." (Ramona R. v. Superior Court, supra, 37 Cal.3d at p. 806.) This rule evolved because allowing the use of the admission would frustrate the philosophy of the juvenile court law, and the law has a great interest in assembling all available information relevant to an informed decision. "`The minor who is subject to the possibility of a transfer order should not be put to the unfair choice of being considered uncooperative by the juvenile probation officer and juvenile court because of his refusal to discuss his case with the probation officer, or of having his statements to that officer used against him in subsequent criminal proceedings.'" (Ibid.)
The Supreme Court compared Ramona R.'s problem to that of a probationer facing revocation of probation for a crime he allegedly committed. (37 Cal.3d at p. 807.)
"When the probation revocation hearing precedes the trial on guilt, the probationer must decide whether to cooperate fully with the probation officer and the court, thereby obtaining fair treatment at the hearing, or to remain silent and preserve his privilege against self-incrimination. In People v. Coleman (1975) 13 Cal.3d 867 ..., we exercised our supervisory powers over the courts to prevent this dilemma. We noted that `It is apparent that the policies served by the due process guarantee of an opportunity for a probationer to be heard at his probation revocation hearing are impinged when he declines to avail himself of this chance for fear of self-incrimination. Constitutional values are similarly disserved when the probationer resolves the conflict in the opposite way by risking self-incrimination so as to testify at such a hearing.' (Id. at pp. 874-875.) This reasoning applies *520 equally to a juvenile considering his options with respect to an interview with a probation officer, a fitness hearing, and a guilt-phase trial. [Citation.]" (37 Cal.3d at p. 807.)
The Supreme Court concluded that Evidence Code section 940 and these use immunities survived the passage of Proposition 8. Evidence Code section 940 provides: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him."
"It is true that section 940 does not on its face refer to use immunities. However, the language of that provision is purposefully broad, and is meant to include within its reach judicial decisions relating to the privilege against self-incrimination. The Law Revision Commission comment to section 940 declares that `Section 940 does not determine the scope of the privilege against self-incrimination; the scope of the privilege is determined by the pertinent provisions of the California and United States Constitutions as interpreted by the courts.'" (Ramona R. v. Superior Court, supra, 37 Cal.3d at p. 808.)
The court found that these use immunities had a constitutional base and thus were within the ambit of Evidence Code section 940. The immunities protect the privilege against self-incrimination. They protect the individual from being forced to choose between the privilege and the opportunity to be heard. Finally, the California Constitution grants such an immunity because of the grave consequences flowing from the dilemma. (37 Cal.3d at pp. 809-811.)
The dilemma in the case here is completely analogous to Ramona R. and the probation revocation cases. Without immunity William is forced to choose between incriminating himself or having little chance of complete reunification with his daughter Jessica. The consequences flowing from this are severe. The dependency proceedings are not pursued for the purpose of marshaling evidence of guilt but are designed to facilitate reunification of the family and to assemble all relevant evidence for the court to make an informed disposition. The burden of the prosecution of proving the defendant guilty beyond a reasonable doubt in the criminal proceedings will be substantially lightened if allowed to take advantage of evidence from a dependency proceeding. If William continues to remain silent in the dependency proceeding on the issue of his intentional abuse, he not only loses his opportunity to present a convincing case for reunification in the dependency proceeding, but also risks that his position of silence on the issue is an indication that he is not cooperating in the reunification process. "`To force an individual to choose ... such unpalatable alternatives runs counter to *521 our historic aversion to cruelty reflected in the privilege against self-incrimination.'" (Ramona R. v. Superior Court, supra, 37 Cal.3d at p. 810.)
(10) The California Constitution requires that a person proceeding simultaneously in the criminal courts for child abuse and the juvenile court regarding a dependency of the abused minor should not only be granted use immunity for his or her testimony at dependency proceedings that constitutes an admission to the acts at issue in the criminal case against him or her but also for such statements made during court-ordered therapy. Under the circumstances of this case, such an immunity is essential to the constitutional privilege against self-incrimination and facilitates the goal of protecting the best interest of the minor and achieving the reunification of the family at the earliest possible date. However, we do not suggest that the immunity bars use of statements made to the therapist if the criminal defendant puts such statements in issue through squarely inconsistent testimony at the criminal trial.
We therefore conclude that the juvenile court's orders to William do not require reversal or a modification of the judgment because the evidence he will be required to present will not impair his right against self-incrimination in the criminal proceedings against him.
The juvenile court's order on review is affirmed.
Franson, P.J., and Stone (W.A.), J., concurred.
On February 24, 1989, the opinion was modified to read as printed above.
NOTES
[*] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II and V.
[1] All code references are to the Welfare and Institutions Code unless otherwise noted.
[*] See footnote, ante, page 504.
[4] In re Katrina L. (1988) 200 Cal. App.3d 1288 [247 Cal. Rptr. 754] held that this statute has survived Proposition 8. (Id. at pp. 1295-1296.)
[5] See Patton, Forever Torn Asunder; Charting Evidentiary Parameters, the Right to Competent Counsel and the Privilege Against Self-Incrimination in California Child Dependency and Parental Severance Cases (1987) 27 Santa Clara L.Rev. 299.