Filed 9/23/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B286844 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA103998) |
| v. | |
| NGOUNSAY KEO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary J. Ferrari, Judge.  Affirmed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Ngounsay Keo appeals from a judgment entered after a jury convicted him of the second degree murder of his girlfriend, Karina Duch, the mother of his two sons, 15-year-old S.L. and eight-year-old S.K.[1]  The jury also found Keo guilty of making a criminal threat on an earlier occasion, and found true the special allegation he used a deadly or dangerous weapon, a knife, in the commission of the murder.  Keo contends the trial court erred in admitting statements he made while in custody to a social worker performing an investigation in a dependency proceeding filed with respect to S.L. and S.K.  He argues the admission of the statements violated his Fifth and Sixth Amendment rights because the social worker failed to provide a warning under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and interviewed him without his attorney present.  Keo also asserts his statements were privileged under Welfare and Institutions Code section 355.1, subdivision (f),[2] as "testimony" in a dependency proceeding.  He urges us to find the statements were privileged, even if they do not qualify as testimony, to protect his due process rights because he was forced to choose between protection of his parental interests in the dependency proceeding and his right not to incriminate himself in the criminal case.

---

[1]     Because the sons have the same initials, we identify the older boy by letters in his first name.

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise noted.  Section 355.1, subdivision (f), provides that "testimony" by a parent, guardian, or other person with care or custody of a minor subject to a dependency proceeding is not admissible as evidence in a separate action or proceeding.

We are troubled by the admission of statements Keo made to the social worker without an attorney present while he was in custody.  But neither section 355.1, subdivision (f), nor the United States and California Constitutions bar use of the statements in his criminal case.  It is up to the Legislature to address in the first instance whether section 355.1, subdivision (f), should be expanded to protect out-of-court statements made by a defendant to a social worker.  Unless the Legislature decides as a matter of policy that protection is warranted, it is up to the defendant, with the advice of his or her attorney in either the criminal case or dependency proceeding, to decide whether to discuss the facts of the alleged crime with the social worker, or to wait until the dependency hearing to testify, at which time the statutory privilege would apply.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The People's Case*
      1.    *Events leading up to the homicide*
      Keo and Duch were in a relationship for more than 20 years, although they were never legally married.  In early 2016 they lived in a one-bedroom apartment with S.L. and S.K.  In 2016 the relationship soured, and Keo became more aggressive toward Duch.  Duch began communicating with other men on a "messenger" phone application.

      Sometime in February or March 2016 Keo slapped Duch on the face.  S.K. was in the room at the time.  S.L. was in the living room and heard Keo yelling at Duch in the bedroom, followed by the sound of a slap.  When S.L. entered the room to see what had happened, he saw Duch crying and holding her cheek, which was red.  S.L. physically restrained Keo to prevent him from harming

3

Duch. Keo was drunk at the time. That same night S.L. was present when Keo threatened Duch, S.L., and S.K., saying, "You're all worthless and I'll kill you all and then myself." S.L. was scared. S.K. was not there, but Duch told him about the threat later. On March 30 Duch went to the police station and filed a criminal threats report.

On April 5, 2016, while Keo was at work, Duch took S.L. and S.K. from their apartment, and they went to live in Duch's family home. That afternoon Keo came to the family home. He was angry and acted in a threatening manner; he demanded to take the family back to the apartment. Duch and the boys refused, and Keo left. The next day Duch obtained a temporary restraining order against Keo. On April 7 a sheriff's deputy personally served Keo with the restraining order.

2. *The homicide*

Despite the restraining order, in August 2016 Duch and S.K. visited Keo, and they went together to watch the Cambodian New Year's day parade. Keo and Duch watched as S.K. danced in the parade. A few days later, on the morning of August 13, Duch and S.K. went to their former apartment to pick up a note from S.K.'s doctor. Keo was there when they arrived. Keo told S.K. to go play at his friend's apartment next door, and S.K. left.

While S.K. was in the neighbors' apartment, he heard a loud scream from Duch and heard her yell "stop." S.K. asked his friend's mother, Mariela Melgar, to call 911. Melgar did not call because she did not hear anything. But she took S.K. and her two children to Keo's apartment on their way to the store. Keo opened the door a little and S.K. asked about his mother. Keo said she was sleeping. Keo went back into the apartment, and Melgar and the children left. When they returned, they again

4

stopped by Keo's apartment.  Keo cracked the door open and said Duch was still sleeping.  S.K. and the children returned to Melgar's apartment to play.

At some point, S.K. returned to Keo's apartment.  He knocked six times, but there was no answer.  The door was unlocked, and S.K. entered.  He saw Keo lying on the floor in the living room, with his internal organs hanging out of his stomach and blood flowing from his stomach.  There was a butcher's knife by Keo's side.  S.K. was scared and ran back to Melgar's apartment.  Melgar went into Keo's apartment, saw him with his stomach "sliced open," and called 911.

Long Beach Police Officer Benjamin Cobb arrived at the scene with his partner and saw Keo lying on the floor in a pool of blood with a large kitchen knife in his right hand.  Keo was conscious and started swinging the knife.  When asked, Keo said Duch was "in the bedroom sleeping."  Officer Cobb entered the bedroom and saw Duch with multiple lacerations to her chest and upper torso.  She had a large laceration on her stomach and her organs were exposed.  Duch was pronounced dead at the scene. An autopsy showed multiple stab wounds to the abdomen, upper chest and lungs, arms, and right hip.  The deputy medical examiner opined the wounds were made by an object with a sharp blade, were not self-inflicted, and could have been caused by the knife held by Keo.

Keo was transported to the hospital, where he underwent surgery for his injuries.

3.      *The dependency investigator's interview with Keo*

On May 11 or 12, 2016, while Keo was in custody recovering in the medical unit of the jail, he was interviewed by Julia Han, a social worker who served as a dependency

5

investigator with the Los Angeles County Department of Children and Family Services (Department).[3] Han spoke to Keo using a telephone in an interview room with a glass partition between them. At the time Han spoke with Keo, Han was aware a criminal case was pending and a dependency petition had been filed. Keo had counsel appointed in this case, but not the dependency proceeding.[4] Keo was alone, and it is undisputed Han did not provide a *Miranda* warning. Han testified her role as a dependency investigator was to investigate a petition filed in dependency court by interviewing all the parties to "gather evidence" and prepare a report to the dependency court. As part of that role, Han assessed the risk to the children and made a recommendation as to whether the parent should retain custody and parental rights over the children. Prior to interviewing Keo, Han called the prosecutor to learn the criminal charges against

---

[3] Because Han was a social worker employed as a dependency investigator by the Department, we use the terms "social worker" and "dependency investigator" interchangeably to refer to Han's position.

[4] In response to Keo's request to take judicial notice, we augment the record to include the April 18, 19, 20, 21, 25, 26, and 27 and May 5 and 26, 2016 minute orders in this case, attached as exhibit A to Keo's August 23, 2018 request for judicial notice. (Cal. Rules of Court, rule 8.155(a)(1)(A).) The records reflect the public defender's office was appointed as counsel for Keo in this case on April 27, 2016. We also take judicial notice of the April 18, May 5, and May 17, 2016 minute orders in the dependency proceeding, Los Angeles Superior Court case No. DK16546, attached as exhibit B to the request for judicial notice. (Evid. Code, §§ 452, subd. (d), 459.) The records reflect dependency counsel was appointed on May 17, 2016 to represent Keo, who was in court on that date.

Keo and the next court date. Han and the prosecutor did not discuss the details of the criminal case, and Han did not tell the prosecutor she was planning to interview Keo.

Although English was not Keo's native language, Han spoke to him in English, and he responded in English. Keo appeared to understand Han's questions. At the outset of the meeting, Han read Keo the allegations in the dependency petition, including that he had murdered Duch and endangered S.K., who saw Keo with his injuries. Han then "asked him about the incident." Keo told Han he killed his wife, then tried to kill himself. Keo repeated that S.K. "was not there." He added as to S.K. being present that he would "never do [a] stupid thing like that." According to Han, Keo "said he killed his wife because the wife tried to take his two sons away from him and that his sons are his whole life and his soul and he cannot live without his sons." Keo said he placed a knife on Duch's "belly" two times. Duch screamed and told Keo, "Don't do that." Keo told Han he attempted to kill himself, but the police arrived first.

Keo admitted he previously threatened Duch that if she took S.L. and S.K. away from him, "something bad would happen." Keo added, "If she takes away my sons, then we all die." He added, "I told her, I told her, but she did not listen." Han testified Keo was not remorseful, but rather, "He sounded as if that was the rightful thing that he did [be]cause he already warned her or told her not to take his sons away from him." However, when asked what he wanted to say to his children, he "apologized for the incident." Keo also admitted he had hit Duch on one prior occasion with his sons present after he learned Duch had a boyfriend. Keo said he "pushed [his] wife's face and slapped her on her forehead."

7

After interviewing Keo, Han obtained a copy of the police report, which she reviewed before preparing her report to the dependency court. Han did not inform the prosecutor or the police about what Keo said, or that she interviewed him. However, an attorney representing the Department, after learning at a dependency hearing of Keo's statements to Han, contacted the prosecutor to inform her of the statements. A year later, in response to a subpoena, the prosecutor obtained a copy of the jurisdiction and disposition report filed in the dependency proceeding, which contained Keo's statements. Han testified to the statements at trial.

B.    *The Defense Case*

Keo testified in his own defense. In March 2016 S.L. showed Keo text messages between Duch and two men. Keo begged Duch to stop communicating with the men. Keo became depressed, drank half a bottle of whiskey, and got "very drunk." He and Duch argued about the texts, she took the bottle away from him, and he moved his arm in a manner such that the back of his hand hit Duch on the cheek. Both boys were in the living room where this happened. Keo and Duch went into the bedroom, and S.L. came in, grabbed Keo, and dragged him out of the room. Keo and Duch argued, and he told her he would kill all of them because he was concerned he would lose Duch and his sons.

The day of the murder, Keo returned from work at 10:00 in the morning. After S.K. went to Melgar's apartment, Keo implored Duch to take him back, but she said 23 years was "enough," and she was taking the children. Keo "lost all [his] memory, [and] went to grab the knife without knowing it." He retrieved the knife from the kitchen, returned, and stabbed Duch.

8

Duch was initially sitting on the couch, but when Keo returned with the knife, she stood up and raised her hands to protect herself. He "lost [his] mind . . . ." Duch screamed and told him to stop, then she fell to the floor. Keo dragged Duch into the bedroom so S.K. would not see what had happened. By this time, Keo believed Duch was dead. Keo closed the bedroom door and wrote a suicide note for his children. Then he cut himself and fell to the floor.

Keo underwent surgery, as part of which he received 32 staples. At the time of Han's interview, Keo was not feeling well, his stab wounds were fresh, and he was in a wheelchair. He was still in "a padded suicide gown."

C.       *Keo's Motion in Limine To Exclude Han's Statements and Closing Arguments*

Prior to trial, Keo filed a motion in limine to suppress Han's testimony, arguing the failure of Han to give a warning before questioning him in custody without a lawyer violated *Miranda* and *Massiah v. United States* (1964) 377 U.S. 201, 206-207 (*Massiah*).[5] The prosecutor responded that Han's role was to assess the risk to the children, not to enforce the law or investigate the crime. Further, Han was not acting at the direction of law enforcement and did not tell the prosecutor or police she planned to interview Keo. The prosecutor only received Han's report a year later when she subpoenaed the jurisdiction and disposition report from the Department. The prosecutor emphasized Keo had an attorney in the dependency

---

[5]      Keo also sought to exclude statements made by Duch in her declaration seeking a temporary restraining order. The trial court granted the motion to suppress as to these statements.

proceeding, who could have requested Keo not be interviewed, but the attorney did not make that request.[6] Keo's attorney responded that the Department was a prosecuting agency because its actions could lead to removal of the children. The court ruled, "I don't think there is a [Sixth] Amendment violation. I don't think any privilege has been violated under the circumstances of this case. . . . I'm going to permit the statement."

In her closing argument, the prosecutor relied on the statements Keo made to Han to support her argument Keo committed first degree murder by acting with express malice. She argued, "In this case let's talk about the words and the actions that the defendant had that make this express malice. First the words. He made a threat, 'You're worthless, I will kill all of you and then myself if you take—' [A]nd then the second two are the words he used with the social worker, he had warned [Duch] that, 'If you take the kids, we both die. If you take away my sons, we all die.' So in this case, it's clear from his words what he was intending on doing." Keo's attorney argued Keo committed voluntary manslaughter because he acted in the heat of passion after Duch told him not only that she was not returning to him, but that she was taking the children.

D.    *The Jury Verdict and Sentencing*

The jury convicted Keo of second degree murder (Pen. Code, § 187, subd. (a)), and found true the special allegation Keo personally used a deadly or dangerous weapon (a knife) in the

---

[6]    As noted, this statement was not accurate because Keo was not appointed counsel in the dependency case until May 17, 2016, after the Han interview.

commission of the crime (Pen. Code, § 12022, subd. (b)(1)).  The jury also found Keo guilty of making a criminal threat (Pen. Code, § 422, subd. (a)).  The trial court sentenced Keo to 15 years to life for the second degree murder, plus one year for the deadly weapon enhancement, plus the upper term of three years for making a criminal threat, for an aggregate sentence of 19 years to life.  Keo timely appealed.

## DISCUSSION

Keo contends his statements to Han should have been suppressed, and they were used by the prosecution to prejudice his heat of passion defense.  He asserts the admission of his statements violated his Fifth Amendment right not to incriminate himself, his Sixth Amendment right to counsel, the statutory protection in section 355.1, subdivision (f), and his due process rights.

A.    *The Dependency Investigator Was Not Required To Provide a* Miranda *Warning Before Interviewing Keo*
      1.    *Standard of review*
      "When reviewing a ruling admitting a confession, we accept the trial court's resolution of any factual dispute to the extent the record supports it, but otherwise we determine independently whether the confession was taken in violation of the rules of *Miranda . . .* , or was involuntary."  (*People v. Sanchez* (2019) 7 Cal.5th 14, 48; accord, *People v. Case* (2018) 5 Cal.5th 1, 20 [In reviewing a trial court's determination of whether admission of a defendant's statements violated *Miranda*, "'[w]e independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally

11

obtained.'"]; *People v. Gamache* (2010) 48 Cal.4th 347, 385 [same].) "To the extent mixed questions of fact and law are present, they are reviewed de novo if predominantly legal and for substantial evidence if predominantly factual." (*Gamache*, at p. 385.) Because the facts are not in dispute, we independently review whether Han was required to provide a *Miranda* warning prior to interviewing Keo.

        2.    *The dependency investigator was not a law enforcement officer or an agent of law enforcement*

"The Fifth Amendment provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' [Citations.] To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation [citation], the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation [citation]. . . . [¶] A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 338-339; accord, *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217 ['"*Miranda* makes clear that in order for defendant's statements to be admissible against him, he must have knowingly and intelligently waived his rights to remain silent, and to the presence and assistance of counsel."'].) "Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374; accord, *Jackson*, at p. 339.)

"California courts have limited [*Miranda*'s] requirements . . . to 'law enforcement officials,' their agents, and agents of the court, while the suspect is in official custody." (*In re Deborah C.* (1981) 30 Cal.3d 125, 130, 134, citations omitted [private store detective was not required to give *Miranda* warning before questioning juvenile after citizen's arrest for shoplifting]; accord, *People v. Thornton* (2007) 41 Cal.4th 391, 432 ["Interrogation thus refers to questioning initiated by the police or its functional equivalent . . . ."]; see *Estelle v. Smith* (1981) 451 U.S. 454, 467 (*Estelle*) [psychiatrist performing court-ordered pretrial psychiatric examination of defendant in custody was required to provide *Miranda* warning as an "agent of the State"].)

Keo contends a dependency investigator is a "peace officer" within the meaning of Penal Code section 830.3, subdivision (h), and therefore is a law enforcement officer subject to the requirements of *Miranda*. Penal Code section 830.3 provides, "The following persons are peace officers whose authority extends to any place in the state for the purpose of performing their primary duty . . . . [¶] . . . [¶] (h) All investigators of the State Department[] of . . . Social Services, . . . provided that the primary duty of these peace officers shall be the enforcement of the law relating to the duties of his or her department or office." Notably, this definition of peace officers only includes investigators for the State Department of Social Services, not dependency investigators employed by a local agency such as the Department. However, this does not end our inquiry because a dependency investigator would be required to provide a *Miranda* warning if he or she acts as an agent of law enforcement. (*In re Deborah C., supra*, 30 Cal.3d at p. 130.)

Keo relies on *Estelle, supra*, 451 U.S. at page 468 and *Mathis v. United States* (1968) 391 U.S. 1 (*Mathis*) to support his

13

argument a dependency investigator acts as an agent of law enforcement when questioning a suspect in custody. Both are distinguishable. In *Estelle,* in holding *Miranda* applied to questioning by a doctor in a court-ordered psychiatric examination, the United States Supreme Court explained, "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because [defendant] did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said [in the evaluation] to establish his future dangerousness." (*Estelle*, at p. 468; accord, *People v. Pokovich* (2006) 39 Cal.4th 1240, 1253 [Fifth Amendment privilege against self-incrimination barred use at trial of statements made by defendant in compelled mental competency examination].) Unlike the defendants in *Estelle* and *Pokovich*, who were required to submit to a court-ordered psychiatric examination, Keo was not required to submit to an interview with Han or answer her questions. While we recognize Keo had an interest in cooperating with the dependency investigator to protect his parental interest in custody of his children, as discussed below, he could have testified fully at any dependency hearing pursuant to section 355.1, subdivision (f), without risking use of his statements in the criminal case.[7]

---

[7] We address below the separate question whether Keo's due process rights were violated by having to choose between speaking with Han to protect his parental interest in keeping his

14

In *Mathis, supra*, 391 U.S. at page 4, the United States Supreme Court held an Internal Revenue Service agent was required to provide a *Miranda* warning before interviewing a suspect who was in custody for a separate offense because "tax investigations frequently lead to criminal prosecutions . . . ." The court rejected the People's argument the agent elicited the incriminating statements during a "'routine tax investigation.'" (*Ibid*.) In contrast to a dependency investigation designed to determine the best interests of a child, an Internal Revenue Service investigator is required under the tax code to refer a case for investigation by an agent who works on criminal matters as soon as the investigator finds "'definite indications of fraud or criminal potential.'" (*Id*. at p. 6, fn. 2 (dis. opn. of White, J.).) In this case Han did not reveal Keo's statements to the police or prosecution; instead, it was only after the prosecution subpoenaed the Department's records that the prosecutor obtained Han's report.

The fact the person conducting the questioning is a government employee is not a sufficient basis to require *Miranda* warnings. For example, in *People v. Wright* (1967) 249 Cal.App.2d 692, a parking lot security guard employed by a county hospital detained the defendant, who had burglarized a car in the parking lot, and questioned him without first giving a *Miranda* warning. The *Wright* court held the defendant's statements to the security guard were admissible because "the interrogator was not the agent of a governmental department, the very function of which was to enforce the law." (*Id*. at p. 694.) Rather, the security guard was an employee of a governmental

_____

children and his right not to incriminate himself in the criminal case.

15

agency whose primary mission was "to make sick people well." (*Ibid*.) As the court explained, "It does not matter that a particular employee's duties may be confined to the protection of persons and property on his employer's premises or that his employer may be the state, a political subdivision thereof or a local entity. What does matter is whether he is employed by an agency of government, federal, state or local, whose primary mission is to enforce the law." (*Id*. at pp. 694-695, fns. omitted.)

Neither does it affect our analysis that the interviewer is a mandatory reporter. In *People v. Salinas* (1982) 131 Cal.App.3d 925, 938, the court concluded a doctor was not required to provide the mother a *Miranda* warning before questioning her about possible child abuse while they were in a small room in the hospital with police officers present. The court explained, "It was not [the doctor's] intent to provide information to law enforcement officers and the medical report was a standard part of the business procedures at the hospital." (*Ibid*.) That the doctor was a mandated reporter of child abuse under the Penal Code did not make him a police agent for purposes of *Miranda* because the "purpose of the statute [was] to bring cases of suspected child abuse to the attention of police authorities as early as possible because of the potential danger to the child when he remains with the abusing parent." (*Id*. at pp. 941-942.)

Han's function as a dependency investigator was to determine the best interests of S.L. and S.K., and whether they should be returned to Keo's custody after his release. "Unlike criminal trials, the primary purpose of dependency hearings is to protect the child, not prosecute the parents." (*In re Corey A.* (1991) 227 Cal.App.3d 339, 346; accord, *In re James F.* (2008) 42 Cal.4th 901, 915 ["[T]he ultimate consideration in a dependency proceeding is the welfare of the child . . . ."]; see

16

§ 202, subd. (a) ["The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public."].)

As the Supreme Court has explained, "In a criminal prosecution, the contested issues normally involve *historical* facts (what precisely occurred, and where and when), whereas in a dependency proceeding the issues normally involve evaluations of the parents' present willingness and ability to provide appropriate care for the child and the existence and suitability of alternative placements." (*In re James F., supra*, 42 Cal.4th at p. 915.) Further, the responsibility to perform the dependency evaluation falls on the social worker. (§ 281 [social worker "shall upon order of any court in any matter involving the custody, status, or welfare of a minor or minors, make an investigation of appropriate facts and circumstances and prepare and file with the court written reports and written recommendations in reference to such matters"];[8] *In re M.B.* (2011) 201 Cal.App.4th 1057, 1071 [§ 281 directs social worker to investigate facts and circumstances and file report with court, which report is admissible (including hearsay) in any dependency proceeding].)

Although no published California cases have addressed whether a social worker in a dependency investigation acts as a law enforcement officer for *Miranda* purposes, courts in other states have consistently concluded a social worker conducting a

---

[8]     Although section 281 places this obligation on a "probation officer," section 215 defines the term "probation officer" to include "any social worker in a county welfare department."

17

dependency investigation is not an agent of law enforcement for purposes of *Miranda* unless he or she acts under the direction or control of law enforcement. (See *State v. Jackson* (2018) 154 Ohio St.3d 542, 551 [116 N.E.3d 1240, 1247-1248] [social worker was not acting as agent of law enforcement in interviewing defendant at jail in response to referral for sexual abuse of child]; *State v. Bernard* (La. 2010) 31 So.3d 1025, 1035 [child protection officer investigating suspected child abuse was not required to provide *Miranda* warning to defendant before interviewing him in custody where the purpose of her interview was to determine whether defendant was a fit parent and police officers did not direct or control interview]; *Wilkerson v. State* (Tex.Ct.App. 2005) 173 S.W.3d 521, 531 [social worker who interviewed defendant in jail as part of dependency investigation was not agent of law enforcement]; cf. *State v. Aguilar* (Tex.Ct.App. 2017) 535 S.W.3d 600, 609-610 [special investigator for child protective services was required to provide *Miranda* warning where he had "'unfettered access'" to police investigative unit, discussed police investigation with detectives before interview, interviewed defendant in police station interrogation room, and detectives advised investigator before interview that defendant had confessed].)

As the Louisiana Supreme Court explained in *State v. Bernard*, "The most important factors are . . . whether the investigator discussed the case with police prior to the interview, whether the interview was conducted at the police's request, and whether the primary purpose of the investigator's visit was to elicit a confession while in cahoots with law enforcement. In short, police may not circumvent *Miranda* by using [child protective services] investigators (or anyone else) as stand-ins to conduct interrogations in their stead." (*State v. Bernard, supra*,

18

31 So.3d at p. 1035, citation omitted; accord, *State v. Jackson, supra,* 116 N.E.3d at pp. 1247-1248 ["[A] social worker's statutory duty to cooperate and share information with law enforcement with respect to a child abuse investigation does not render the social worker an agent of law enforcement for purposes of the Fifth and Sixth Amendments to the United States Constitution when the social worker interviews an alleged perpetrator unless other evidence demonstrates that the social worker acted at the direction or under the control of law enforcement."].)[9]

Here, Han did not discuss the facts of the case with the police or prosecutor prior to interviewing Keo. She only called the prosecutor to find out the charge brought against Keo and the status of the criminal case. Neither did Han inform the police or the prosecutor that she intended to interview Keo. Although the Department's attorney later advised the prosecutor that Keo had made statements to Han, the prosecutor did not obtain a copy of Keo's statements until a year after the interview, in response to the prosecutor's subpoena requesting Han's report. Thus, Han was not acting as law enforcement or an agent of law

---

[9] *State v. Brown* (2008) 286 Kan. 170 [182 P.3d 1205], relied on by Keo, is inapposite. *Brown* involved a confession to the police after the defendant was given a *Miranda* warning, not a statement to a social worker. (*Id.* at p. 1208.) The court concluded the father's confession was not voluntary because he was told by the social worker his parental rights would be terminated unless he explained how his baby sustained injuries. (*Id.* at p. 1211.) The court concluded the father's confession to the police on the day of the hearing on termination of his parental rights was not voluntary because he had "a 'classic penalty' situation," which required him to choose between giving up his right against self-incrimination and losing his parental rights. (*Id.* at p. 1212.)

19

enforcement for purposes of *Miranda*. (*Estelle, supra*, 451 U.S. at p. 467; *In re Deborah C., supra*, 30 Cal.3d at p. 130.)

B.  *Admission of Keo's Statements to the Dependency Investigator Did Not Violate His Sixth Amendment Right to Counsel*

Keo contends his Sixth Amendment right to counsel was violated when Han, as a "state agent" deliberately elicited incriminating statements from him in the absence of his attorney. We agree with the People a social worker who serves as a dependency investigator is not a law enforcement officer, and, on the facts here, Han was not acting on behalf of law enforcement.

"[O]nce a judicial proceeding has been initiated against an accused and the Sixth Amendment right to counsel has attached, any statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against the defendant." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 66-67; accord, *Massiah, supra*, 377 U.S. 201, 206-207; *People v. Almeda* (2018) 19 Cal.App.5th 346, 358-359.) The United States Supreme Court in *Massiah* held the statements of a codefendant who elicited incriminating statements from the defendant, who was unaware the codefendant was cooperating with the police in recording the conversation, violated the defendant's Sixth Amendment right to counsel by eliciting incriminating statements from him without his lawyer present. (*Massiah*, at pp. 205-206.)

To prevail on a *Massiah* claim, the defendant has the burden of showing the statement was obtained by someone who "'(1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the

20

expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements.'" (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 67; accord, *People v. Hartsch* (2010) 49 Cal.4th 472, 491; see *Estelle, supra*, 451 U.S. at p. 471 [admission of psychiatrist's testimony relaying defendant's statements during court-ordered examination violated defendant's Sixth Amendment right to counsel].) "The requirement of agency is not satisfied when law enforcement officials 'merely accept information elicited by the [individual] on his or her own initiative, with no official promises, encouragement, or guidance.'" (*Coffman and Marlow*, at p. 67; accord, *Hartsch*, at p. 491.) "A trial court's ruling on a motion to suppress informant testimony is essentially a factual determination, entitled to deferential review on appeal." (*Coffman and Marlow*, at p. 67; accord, *Hartsch*, at p. 491.)

The cases following *Massiah* have focused on whether the defendant can show "the deliberate elicitation by law enforcement officers (and their agents) of statements pertaining to the charge." (*Kansas v. Ventris* (2009) 556 U.S. 586, 590; accord, *Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459 ["the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation"].)[10] Therefore, our Fifth

---

[10] Keo's reliance on *People v. Arauz* (1970) 5 Cal.App.3d 523, 530, disapproved on other grounds in *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 716, footnote 14, is misplaced. The court in *Arauz* considered, but did not reach, whether the defendant's statements to a parole officer violated his Sixth Amendment right to counsel under *Massiah*. Rather, the court based its conclusion there was no Sixth Amendment violation on the fact the

Amendment analysis of whether Han in her role as a dependency investigator was a law enforcement officer or agent of law enforcement applies equally to our determination whether Han's interview of Keo violated Keo's Sixth Amendment right to counsel. As discussed, Han was neither law enforcement nor an agent of law enforcement.

Although there are no California published cases addressing whether a dependency investigator is an agent of law enforcement under *Massiah*, courts in other states have addressed this issue, applying the same analysis applicable to consideration of a defendant's Fifth Amendment rights under *Miranda*. (See *State v. Jackson, supra*, 116 N.E.3d at pp. 1247-1248 [defendant's statements to social worker did not violate his Sixth Amendment right to counsel because social worker was not acting as agent of law enforcement in child abuse investigation]; cf. *State v. Oliveira* (R.I. 2008) 961 A.2d 299, 310 [admission of defendant's statements to child protective investigator violated his Sixth Amendment right to counsel where state law provided for investigator to work cooperatively with law enforcement, investigator met and exchanged information with police a day before interview, investigator was required to forward information regarding alleged abuse to police, and one of purposes in interviewing defendant was to "'add to the evidence'"]; *Commonwealth v. Howard* (2006) 446 Mass. 563, 567, 569 [845 N.E.2d 368, 371-373] [statements to social services investigator while defendant was in jail violated his Sixth Amendment right to counsel where investigator was working as a team with the police and prosecutor's office, asked questions only

defendant blurted out to the officer that he had killed the victim. (*Arauz*, at p. 530.)

22

relating to defendant's guilt, and forwarded her report describing the interview to the prosecutor's office].)

As discussed, Keo's contention Han was a government agent because a dependency investigator is a "peace officer" within the meaning of Penal Code section 830.3, subdivision (h), lacks merit. Keo's contention Han was an agent of law enforcement for purposes of Keo's right to counsel likewise is not persuasive. Han was not acting "'under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage.'" (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 67.) Although it is undisputed Keo's Sixth Amendment right to counsel had attached because counsel was appointed in the criminal case prior to Han's interview, as discussed, Han's investigation was conducted for the purpose of determining the best interests of the children, not to develop evidence to assist law enforcement in the criminal case. Han did not discuss the facts of the case with law enforcement or the prosecutor before interviewing Keo, and she did not provide her report to the prosecution until a year after the interview, in response to a subpoena.

C.  *Neither Section 355.1, Subdivision (f), Nor Keo's Right to Due Process Bars Admission of Keo's Out-of-court Statements to the Dependency Investigator*

1.  *Standard of review*

"We review questions of statutory construction de novo. Our primary task 'in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent. [Citation.]' [Citation.] We construe the statute's words in context, harmonizing statutory

23

provisions to avoid absurd results.  [Citation.]  If the statutory text is susceptible to more than one reasonable construction, we may consider extrinsic aids such as legislative history to facilitate our interpretative analysis."  (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041; accord, *United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089.)

> 2.      *Keo has forfeited his argument section 355.1, subdivision (f), provided statutory immunity for his statements to the dependency investigator, and even if forfeiture did not apply, the statements do not constitute testimony*

The People contend Keo forfeited his right to argue his statements to Han were protected under section 355.1, subdivision (f), because he raises the argument for the first time on appeal.  We agree.  Evidence Code section 353 provides, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ."  In accordance with section 353, "[r]eviewing courts will generally not consider a challenge to the admissibility of evidence unless there was a ""specific and timely objection in the trial court *on the [same grounds] sought to be urged* on appeal.""" (*People v. Gomez* (2018) 6 Cal.5th 243, 286, italics added; accord, *People v. Partida* (2005) 37 Cal.4th 428, 433.)

As the *Partida* court explained, "'The reason for the requirement is manifest:  a specifically grounded objection to a

defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.'" (*People v. Partida, supra*, 37 Cal.4th at p. 434.) However, the court added, "[T]o further these purposes, the requirement must be interpreted reasonably, not formalistically. 'Evidence Code section 353 does not exalt form over substance.'" (*Ibid.*)

Keo argued in the trial court that admission of his statements to Han violated his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel, not that the admission violated either section 355.1, subdivision (f), or his due process rights. To the extent Keo argues for the first time on appeal section 355.1, subdivision (f), applies to bar use of his statements to Han, he has forfeited this issue on appeal. (*People v. Gomez, supra*, 6 Cal.5th at p. 286; *People v. Partida, supra*, 37 Cal.4th at p. 433.)[11]

Even if Keo had not forfeited his challenge to the admissibility of his statements based on section 355.1, subdivision (f), this argument fails because his out-of-court

---

[11] However, Keo has not forfeited his argument that admission of his statements violated his due process rights by forcing him to choose between his interest in protecting his parental rights and his right against self-incrimination because a "defendant may argue an additional legal consequence of the asserted error in overruling [his objection to admission of the evidence] is a violation of due process." (*People v. Partida, supra*, 37 Cal.4th at p. 438; accord, *People v. Gomez, supra*, 6 Cal.5th at p. 287.)

25

statements do not constitute "testimony."[12]  Under section 355.1, subdivision (f), "[T]estimony by a parent, guardian, or other person who has the care or custody of the minor made the subject of a proceeding under Section 300 shall not be admissible as evidence in any other action or proceeding."  "'Testimony' is generally described in both statutory and decisional law as oral statements made by a person under oath in a court proceeding. The term 'testify' is referred to in identical language in the Penal Code, the Code of Civil Procedure, and the Civil Code: '. . . every mode of oral statement, under oath or affirmation, is embraced by the term "testify," . . .' [Citations.]  . . . [Citation.]  '. . . Testimony is limited to that sort of evidence which is given by witnesses speaking under oath or affirmation [citation] . . . .'" (*People v. Belton* (1979) 23 Cal.3d 516, 524, 526, fn. omitted [discussing "literal construction" of "testimony," but holding definition of accomplice "testimony" under Pen. Code, § 1111 could include specified out-of-court statements beyond literal definition to further legislative intent]; accord, *People v. Williams* (1997) 16 Cal.4th 153, 245; see Pen. Code, § 7 ["every mode of oral statement, under oath or affirmation, is embraced by the term 'testify'"]; Code Civ. Proc., § 17, subd. (b)(5)(B) ["'Testify' includes any mode of oral statement made under oath or affirmation."]; Civ. Code, § 14, subd. (a) ["every mode of oral statement, under oath or affirmation, is embraced by the term 'testify'"]; see also Evid. Code, § 710 ["Every witness before testifying shall take an

---

[12]     Because we conclude section 355.1, subdivision (f), does not apply to Keo's out-of-court statements, we do not reach his argument his attorney's failure to object to admission of his statements on this basis constituted ineffective assistance of counsel.

26

oath or make an affirmation or declaration in the form provided by law . . . ."].)

As the Court of Appeal explained in *In re Jessica B.* (1989) 207 Cal.App.3d 504, 518 (*Jessica B.*), "[T]he immunity provided by section 355.1 . . . is limited to statements of the parent in court, i.e., 'testimony' in the strict sense of the word . . . ." The court observed, "[E]ven though a more expanded definition of testimony to include all statements, in or out of court, is more consistent with the policy of the statute 'that all relevant evidence should be disclosed in proceedings of this nature in order to protect the paramount interest of the safety and welfare of the child' [citation], it is clear this is not what was intended when this provision was added." (*Jessica B., supra*, 207 Cal.App.3d at p. 518.) Therefore, Keo's conversation with Han in the jail's medical unit, not under oath, does not constitute "testimony" under section 355.1, subdivision (f).

> 3. *Admission of Keo's statements to the dependency investigator did not violate his due process rights*

Keo urges us to expand the immunity provided for testimony under section 355.1, subdivision (f), to out-of-court statements made to a dependency investigator, relying on *Jessica B., supra*, 207 Cal.App.3d at page 521, which expanded immunity to cover statements made in court-ordered therapy, *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*), which conferred immunity for an individual's statements made in a probation revocation hearing, and *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802 (*Ramona R.*), which provided immunity for statements made by a minor in a juvenile fitness hearing. Although we are troubled by use of Keo's statements to the dependency investigator in his criminal trial, there is no

constitutional or statutory basis to expand immunity to protect all statements made by a parent to a social worker. Instead, this is an issue that would need to be addressed by the Legislature in the first instance.

In *Jessica B.*, the Court of Appeal concluded a father's due process rights were violated where the juvenile court denied him the right to reunify with his infant daughter based on the father's physical abuse of his daughter and his refusal to take responsibility for the abuse in court-ordered therapy for fear he would incriminate himself. (*Jessica B., supra*, 207 Cal.App.3d at pp. 517-518.) The court noted the father could freely testify at the dependency hearing, but the statements he made in therapy would not be statutorily protected. (*Ibid*.) The court explained, "The California Constitution requires that a person proceeding simultaneously in the criminal courts for child abuse and the juvenile court regarding a dependency of the abused minor should not only be granted use immunity for his or her testimony at dependency proceedings that constitutes an admission to the acts at issue in the criminal case against him or her but also for such statements made during court-ordered therapy." (*Id*. at p. 521.)

The *Jessica B.* court reasoned, "Without immunity [the father] is forced to choose between incriminating himself or having little chance of complete reunification with his daughter Jessica. The consequences flowing from this are severe. The dependency proceedings are not pursued for the purpose of marshaling evidence of guilt but are designed to facilitate reunification of the family and to assemble all relevant evidence for the court to make an informed disposition. The burden of the prosecution of proving the defendant guilty beyond a reasonable doubt in the criminal proceedings will be substantially lightened

28

if allowed to take advantage of evidence from a dependency proceeding. If [the father] continues to remain silent in the dependency proceeding on the issue of his intentional abuse, he not only loses his opportunity to present a convincing case for reunification in the dependency proceeding, but also risks that his position of silence on the issue is an indication that he is not cooperating in the reunification process." (*Jessica B., supra*, 207 Cal.App.3d at p. 520.)

Other Courts of Appeal have applied *Jessica B.*'s reasoning to provide immunity for court-ordered treatment or evaluations in dependency proceedings. (See *In re D.C.* (2015) 243 Cal.App.4th 41, 57 [immunity for statements made in court-ordered therapy]; *In re Joanna Y.* (1992) 8 Cal.App.4th 433, 441 [immunity for statements made during court-ordered psychological evaluation]; *In re Lamonica H.* (1990) 220 Cal.App.3d 634, 650 [immunity for statements made by parent during court-ordered psychological treatment].)

In fashioning an exclusionary rule, *Jessica B.* relied on the Supreme Court's earlier holdings in *Coleman* and *Ramona R.* In *Coleman*, the defendant was indicted for grand theft and faced a probation revocation hearing based on the facts supporting the criminal charge. The Supreme Court created a "judicial rule of evidence" that made the testimony of the probationer at the probation revocation hearing "inadmissible against the probationer during subsequent proceedings on the related criminal charges, save for purposes of impeachment or rebuttal" in limited circumstances. (*Coleman, supra*, 13 Cal.3d at p. 889.) The Supreme Court explained, "It is apparent that the policies served by the due process guarantee of an opportunity for a probationer to be heard at his probation revocation hearing are impinged when he declines to avail himself of this chance for fear

29

of self-incrimination.  Constitutional values are similarly disserved when the probationer resolves the conflict in the opposite way by risking self-incrimination so as to testify at such a hearing." (*Id*. at pp. 874-875.)  Thus, "when an alleged probation violation also constitutes a criminal offense for which the probationer might subsequently be prosecuted, he may be presented with the 'cruel trilemma' of self-accusation, perjury or injurious silence." (*Id*. at p. 878.)

The Supreme Court in *Ramona R., supra*, 37 Cal.3d at pages 809 to 810*,* extended *Coleman* to a minor's statements at a fitness hearing to determine whether she should be tried as an adult or was "'amenable to the care, treatment, and training program available through the facilities of the juvenile court'" (*id*. at p. 805).  Notably, the court included within the scope of its protection statements made by the minor to her probation officer, who was statutorily required "to file a report on the minor's 'behavioral patterns and social history.'" (*Ibid*.)  The minor declined to be interviewed by the probation officer or to testify at the fitness hearing for fear her statements would be used in her subsequent criminal trial for murder. (*Ibid*.)  The probation officer concluded the minor was not amenable to treatment in the juvenile system, and the referee agreed. (*Id*. at p. 806.)

The Supreme Court, in holding the *Coleman* exclusionary rule applied to the minor's statements to the probation officer and testimony at the hearing, observed, "The purpose of [the probation officer's] interview is not the marshalling of evidence on the issue of guilt, but rather the assembling of all available information relevant to an informed disposition of the case if guilt is established [citations], or to assist in the evaluation of the minor's fitness for treatment as a juvenile [citation].  Such decisions, courts have uniformly concluded, should be based on

the most complete knowledge of the defendant's background that is possible. . . .' [Citation.] 'The minor who is subject to the possibility of a transfer order should not be put to the unfair choice of being considered uncooperative by the juvenile probation officer and juvenile court because of his [or her] refusal to discuss his case with the probation officer, or of having his [or her] statements to that officer used against him [or her] in subsequent criminal proceedings.'" (*Ramona R., supra*, 37 Cal.3d at p. 806.) The court emphasized the "'trilemma'" faced by the juvenile of having to choose among remaining silent and losing an opportunity "to present a conceivably convincing case" against treatment under the juvenile court laws; risking self-incrimination by submitting to an interview and testifying; and testifying falsely at the fitness hearing to avoid use of damaging statements in the subsequent criminal trial. (*Id.* at p. 810.)

Keo did not confront the stark choice faced by the defendants in *Jessica B.*, *Coleman*, and *Ramona R.* He could have spoken with Han about all aspects of his parenting of S.L. and S.K., but declined to discuss the events leading to Duch's death. Then, at the dependency hearing he could have explained the incident in full, protected by the statutory privilege under section 355.1, subdivision (f). By contrast, the defendants in *Jessica B.*, *Coleman*, and *Ramona R.* had to choose between incriminating themselves and failing to participate in court-ordered therapy (*Jessica B.*), refusing to testify at a probation revocation hearing (*Coleman*), or declining to speak with the probation officer and testify at a fitness hearing (*Ramona R.*).[13]

_____

[13] Neither *In re S.C.* (2006) 138 Cal.App.4th 396 nor *In re Fred J.* (1979) 89 Cal.App.3d 168 supports Keo's argument his rights in the dependency proceeding would be jeopardized by his

31

Although the Supreme Court in *Ramona R.* extended immunity to statements by the minor to her probation officer, the court relied on the probation officer's role in evaluating the minor's potential for rehabilitation, which took into account the minor's "'acknowledgment of guilt and demonstration of remorse,'" and the fact the minor could not explain the circumstances to the probation officer without incriminating herself. (*Ramona R., supra*, 37 Cal.3d at p. 806.) Here, the dependency investigator was required to investigate the "appropriate facts and circumstances" and file a report with the court containing her recommendations for how to protect S.L. and S.K. (§ 281.) The dependency investigator's role was not to investigate the historical facts of how the crime was committed, but to evaluate "the parents' present willingness and ability to provide appropriate care for the child and the existence and suitability of alternative placements." (*In re James F., supra*, 42 Cal.4th at p. 915.) Although the question whether either child was present at the time of Duch's murder was relevant to the dependency investigator's evaluation of whether Keo could

---

failure to speak to the dependency investigator. Keo asserts in *In re S.C.* the mother's refusal to speak to the social worker without her counsel present led to the agency filing a dependency petition. But the Department filed the petition not because of the mother's refusal to speak with the social worker, but because the mother "had changed her mind and no longer agreed to informal supervision in lieu of court intervention via a dependency petition." (*In re S.C.*, at p. 408.) Similarly, in *In re Fred J.*, the court's finding of substantial evidence of abuse was based on the children's behavioral and emotional problems the mother had not addressed, not the mother's refusal to speak with the Department. (*In re Fred J.*, at pp. 180-181.)

32

protect his children, Keo could testify to this fact at the dependency hearing.  This single fact was not as central to Han's evaluation as the probation officer's consideration in *Ramona R.* of the minor's remorse about committing the crime, which was critical for the probation officer's evaluation of whether the minor was capable of rehabilitation.

## DISPOSITION

The judgment is affirmed.

FEUER, J.

WE CONCUR:

ZELON, Acting P. J.

SEGAL, J.