Filed 10/19/20  M.C. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| M.C.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G059208<br><br>(Super. Ct. No. 20DP0142)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Antony C. Ufland, Judge.  Petition denied.

Amanda M. Tarby, under appointment by the Court of Appeal, for Petitioner M.C.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su Deputy County Counsel, for Real Party in Interest.

Law Office of Harold LaFlamme and Hannah Gardner for Minor.

\*     \*     \*

M.C. (Mother) petitions for an extraordinary writ (Cal. Rules of Court, rules 8.450, 8.452) in the dependency case of her child, J.Q. She challenges the juvenile court's order after a contested disposition hearing. The court denied family reunification services to Mother[1] pursuant to the bypass provision set forth in Welfare and Institutions Code section 361.5, subdivision (b)(10),[2] and scheduled a section 366.26 hearing (.26 hearing) for November 3, 2020. Mother contends the juvenile court should have granted her reunification services because she had demonstrated reasonable efforts, as shown by her participation in services and willingness to participate in more. We find no error and deny the petition.

FACTS

I. *Pre-Detention and Detention*

On January 28, 2020, the Orange County Social Services Agency (SSA) requested a protective custody warrant for newborn J.Q. based on allegations of failure to protect. At the time of J.Q.'s birth, Mother had open family reunification cases with J.Q.'s four maternal half siblings, J.P. (13 years old), G.P. (12 years old), G.Q. (7 years old), and M.Q. (1 year old). The warrant was granted. J.Q. was placed with a foster family.

On January 30, 2020, SSA filed a petition alleging J.Q. came within section 300, subdivisions (b), (g), and (j). The petition stated J.Q. was at risk of abuse or neglect because SSA had removed four half siblings from Mother's custody due to a history of domestic violence with multiple partners, physically abusing minor's half sibling, and failing to protect a half sibling from sexual abuse by another half sibling.

---

[1]       Father is not a party to this appeal.

[2]       All further statutory references are to the Welfare and Institutions Code.

2

Specifically, the most recent incident of domestic violence was in September 2019 and involved J.Q.'s father (Father) while Mother was pregnant. According to a Child Abuse Registry report, Mother and her then boyfriend, Father, were walking together. Father put Mother on the ground, slapped her in the face, and according to third parties was hitting her in the stomach. Bystanders went to Mother's aid, and Father fled. Mother got up and denied anything happened and said it was her fault. No children were present during the altercation.

Initially, a November 2008 incident brought the family to SSA's attention, when C.P., father to J.P. and G.P., held a 12-inch knife to Mother's neck, threatened to kill her and then himself, in the presence of the children. The juvenile court determined C.P. behaved violently towards Mother and she failed to take steps to protect herself and the children. From 2006 until 2008, C.P. had a history of physical violence toward Mother, as well as driving under the influence.

The first dependency case lasted from December 2008 to August 2009 for J.P. and G.P. These two siblings were left in Mother's care under a plan of family maintenance. Mother moved to a shelter and successfully completed a personal empowerment program (PEP), counseling, parenting, and in-home supportive services. The court closed the case in August 2009, awarding Mother sole legal and physical custody. C.P. returned to El Salvador and was no longer involved with the children.

From November 2013 to May 2014, Mother received voluntary family services due to allegations she physically abused G.P. From May 2014 to May 2016, Mother had a second dependency case for J.P., G.P., and G.Q. From November 2013 to 2020, Mother received voluntary family services stemming from a substantiated allegation of physical abuse to G.P. and to assist Mother in addressing the half siblings' behavioral issues. During the child abuse investigation, G.P. was observed to have two four-inch linear marks on his arm and G.P. reported he was struck with a mop stick, a cloth belt, or Mother's hand. In February 2014, G.P. had a mark on his face. SSA

3

deemed the allegation of physical abuse inconclusive, but voluntary services were extended. The petition further alleged G.P. had sexual contact with J.P. and Mother was aware G.P. exhibited sexualized behavior and she did not address it. When Mother was approached about the sexual abuse allegations, Mother accused J.P. of lying, told her not to lie, and J.P. subsequently recanted. SSA closed the case in May 2016.

Mother's third proceeding was her current case for J.P., G.P., and G.Q., starting in October 2018. That sustained petition reported Mother hit G.P., which resulted in a bloody nose and a "'scratch'" under his right eye. Mother stated she hit G.P. over the bed covers with an unknown object because he did not want to get ready for school. The court ordered the half siblings to remain in out-of-home care, it gave Mother reunification services, and unsupervised visits. She violated the rules on the first weekend, resulting in an end to unsupervised visits. Mother had not been able to secure a place to live, had trouble finding work, and had been one to two hours late or cancelled her appointments with the assigned social worker. In addition, Mother and Father had a domestic violence incident, leading her landlord to call the police. Mother denied domestic violence with Father, claiming it was just a normal couple's argument. Mother completed individual counseling and a PEP. The service providers for those two programs did not state any concerns and reported Mother participated and attended all her classes. Mother claimed she only had a handful of classes left in her child abusers program. Mother had not completed her eight hours of supervised visits, and had declined an offer for additional hours, claiming scheduling reasons. The court terminated reunification services as to J.P., G.P., and G.Q. and set a .26 hearing for May 2020.

Mother's fourth proceeding was the current case for M.Q., starting in December 2018. M.Q. was declared a dependent pursuant to section 300, subdivisions (b) and (j). The sustained petition stated that on December 14, 2018, when Mother gave birth to M.Q., M.Q.'s half siblings were currently dependents in out-of-home care and the alleged father may have unresolved substance abuse history with alcohol and has a

4

history of convictions for driving under the influence. The juvenile court ordered M.Q. to remain in out-of-home care with reunification services provided to Mother.

The juvenile court held J.Q.'s detention hearing on January 31, 2020. The court detained J.Q. from the parents, ordered visitation for Mother only, and set a jurisdiction hearing for March 16, 2020.

II. *Jurisdiction and Disposition Hearing*

SSA's status reports indicated that in February 2020, Mother enrolled in an additional domestic violence PEP. Also in February 2020, Mother signed two counseling referrals.

SSA also reported by April 2020, Mother had participated in two therapy sessions. The therapist reported she seemed cooperative and engaged during the sessions. That same month, Mother completed a 10-week PEP for victims of domestic violence.

Regarding Mother's visits with J.Q., "the mother bonded well with" the minor. She was tardy to six visits and missed a visit on February 16, 2020, due to transportation issues. On March 8, 2020, Mother arrived early to her visit, left on time and "was very attentive" to J.Q.'s needs. Mother fed J.Q., changed her diaper, cuddled with her, and rocked her to sleep.

In April, Mother moved to Santa Ana and reported she would be able to arrive on time to visits as she was closer to the visitation center. When in person visitation was suspended due to COVID-19, the caregiver reported Mother held video calls with J.Q. once a week. The caregiver reported being the one who reaches out to facilitate the video visits.

At the jurisdiction hearing, the juvenile court found true the allegations in the petition, declared J.Q. a dependent of the court, removed her from her parents' custody, and set a contested disposition hearing for May 2020. Due to continuances, the disposition hearing occurred in July 2020.

Social worker Pedro Vargas testified at the disposition hearing. Vargas testified he did not recommend reunification services for Mother "because she has three half siblings who were recently recommended no family reunifications." Vargas stated the three half siblings were removed from Mother's care due to allegations of physical abuse to G.P., allegations of sexual abuse from one sibling to another, and initial issues of domestic violence and substance abuse by the alleged father. He also testified the last incident of domestic violence between Mother and Father occurred on September 22, 2019. Vargas stated Mother completed a parenting class, a PEP, volunteered for a second PEP personal empower program, and was in counseling.

Vargas stated Mother told him she learned from her PEP "she understands the value of women [and] . . . about not allowing men to take advantage of her and self-respect and empowerment." When Vargas was asked, "What efforts have you seen the mother make in order to alleviate the prior concerns of the agency removing her children . . . ?" he responded as follows: "So the mother's been compliant. She's shown initiative in enrolling and participating in services. In my case, she's maintained open communication. She's very easily accessible and she's been compliant with her services. The only setback that she recently has was the no-shows for the counseling, but besides that, she's been complying and on time."

Mother's therapist reported to SSA that she spoke to Mother about issues of domestic violence in the past, and that she was forthcoming. The therapist also stated Mother was not presently in a relationship and had opened up about domestic violence between Mother and J.P., and G.P.'s father. Mother did not admit to domestic violence between herself and Father. Mother had addressed physical discipline of G.P. in counseling because the therapist recommended for Mother to have conjoint sessions with G.P. Mother reportedly missed three counseling sessions for various reasons.

Before Mother lived in Santa Ana, out of six visits she was tardy four times and a no-show for the fifth. After Mother moved to Santa Ana, she attended visits on

6

time and left on time and the visits seemed appropriate. After COVID-19 restrictions, Mother spoke with J.Q. once a week via video with no concerns. Mother did not use the full amount of time authorized to visit with J.Q., and the caretaker often initiated visitation. Vargas wanted to give Mother unsupervised visitation because she had been compliant with her case plan and was progressing with the visits prior to restrictions from COVID-19. Mother never brought a man to a visit.

Mother also testified at the hearing. Mother stated she just wanted to be with her children and was not concerned about other people right now. She testified she would complete more services to reunify with J.Q. She also said she would continue to participate in counseling. Mother reported she had a job and was financially independent. Mother admitted to hitting G.P. with her hand, and a cloth belt. Mother stated she accidentally hit G.P. with the handle of a mop or broom as she was going to hit him on his buttocks, but he placed his hand there and she hit his hand instead. Mother testified on another occasion, she hit G.P. on the leg and buttocks because he did not want to get out of bed. Mother stated she did not hit him on the face and did not know how he became injured with a bloody nose and bruise on his face.

Mother further testified she thought physically disciplining her children was wrong and had learned she needed to speak to her children without yelling. She completed one PEP and volunteered for a second PEP. Mother said Father never pushed her to the ground while she was pregnant with J.Q. or slapped her face. Mother stated she learned from the PEP that she must earn her respect and "don't allow for any man to be disrespectful. Don't allow him to . . . wrestle you around."

Mother stated she "learned in counseling was one has to learn one's own self-worth and when I talked to the therapist, I told her what had happened regarding domestic violence with the father of my children, so that's when I learned again one has to learn one's own self-worth and to love yourself and also, do not allow for someone else to bring down your self-esteem." She also discussed the concerns of physical

7

discipline with G.P. with her counselor and recognized she would lose her patience and she stated she was taught to "speak to him without yelling, without hitting and she needed to speak to him with good words because she told me that when you speak to a child yelling, they're not going to really listen to you." Mother said she enjoyed visits with J.Q., "because when I'm with her, I feel her. I feel happy when I hold her and she just looks at me, and when they're little like that, that's when you enjoy them the most."

III. *The Court's Ruling*

At the conclusion of the hearing, Mother requested immediate return, or for the juvenile court to find that section 361.5, subdivision (b)(10), did not apply and order reunification services. Ultimately, the court ordered no reunification services for Mother and set a .26 hearing.

The juvenile court noted this was not an easy case where no efforts have been made. Instead, the court acknowledged Mother "has definitely made some efforts, in terms of [PEP] classes and made some progress, in terms of what she can reiterate from what she gleaned from those classes; but the court has to take a look at the totality of where Mother is at after having engaged in those efforts to determine whether or not they were reasonable." Specifically with regard to G.P., the court made the following observations: "there is still an element of minimizing that conduct and while Mother was able to articulate what she needs to do in the future, in terms of disciplining children and dealing with their behaviors, part of understanding and learning and at successful efforts or some degree of progress in those efforts has to do with understanding and acceptance of where a parent went wrong previously, and that involves a willingness to fully accept that is what I did. I used to hit him with a stick or a belt. I caused that. And not it's because it was an accident or I meant to hit him here and he moved so he ended getting hit here, or, you know, minimal language with regard to a bloody nose."

As to the issue of domestic violence, the juvenile court explained, "the court has to look at [Mother's] testimony in its entirety, in terms of determining whether

8

the reasonableness of the [PEP] classes, counseling and other things that Mother may have done in order to address domestic violence in the past and whether or not those efforts are reasonable." It continued, "Mother . . . continues to minimize . . . conduct that [Father], rather than fully acknowledging and sharing what happened, there is overwhelming evidence from the reports, from witnesses cited in the reports, about what, actually, happened. The court can't see any reason--any logical reason why Mother would continue to minimize that incident and what happened in that incident, minimizing it, not giving it full--accepting its full this is what happened and it was wrong. Short of that, there's still a problem, and so there's this lack of progress--enough progress to describe the efforts as reasonable in domestic violence."

## DISCUSSION

Mother contends the juvenile court erred by utilizing the bypass procedure set forth in section 361.5, subdivision (b)(10), denying reunification services, and setting the .26 hearing. We disagree.

I. *Underlying Law and Standard of Review*

Reunification services may not be provided if the court finds by clear and convincing evidence "the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling . . . and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian." (§ 361.5, subd. (b)(10).) "The 'reasonable effort[s]' necessary to avoid section 361.5, subdivision (b)(10) bypass are not synonymous with "'cure.'" [Citation.]" (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121 (*Jennifer S.*).) The efforts must be more than "'lackadaisical or half-hearted.' [Citation.]" (*K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393.) "The inclusion of the 'no-reasonable effort' clause in the statute provides a means of mitigating an otherwise harsh rule that would allow the court

to deny services simply on a finding that services had been terminated as to an earlier child when the parent had in fact, in the meantime, worked toward correcting the underlying problems." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 842.)

"If the evidence suggests that despite a parent's substantial history of misconduct with prior children, there is a reasonable basis to conclude that the relationship with the current child could be saved, the courts should always attempt to do so. . . . The failure of a parent to reunify with a prior child should never cause the court to reflexively deny that parent a meaningful chance to do so in a later case. To the contrary, the primary focus of the trial court must be to *save* troubled families . . . ." (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464.)

"[S]ection 361.5, subdivision (b), exempts from reunification services "'those parents who are unlikely to benefit'" [citation] from such services or for whom reunification efforts are likely to be 'fruitless' [citation]." (*Jennifer S.*, *supra*, 15 Cal.App.5th at pp. 1120-1121.) Under that subdivision, services need not be provided when the court finds by clear and convincing evidence the parent falls into one or more specified circumstances, including physically abusing a half sibling and exposing the half siblings to domestic violence. (*Id*. at pp. 1120-1121.) Such a finding is reviewed for substantial evidence. (*Ibid.*) A reviewing court does not reweigh the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Under section 361.5, "once the juvenile court determines a parent is described by subdivision (b)(10), it shall not order reunification services for that parent 'unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child.' [Citation.] . . . "'[T]o determine whether reunification is in the child's best interest, the court considers the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity.' [Citations.]

10

. . . We review a juvenile court's best interest determination in this context for abuse of discretion. [Citation.]" (*Jennifer S.*, *supra*, 15 Cal.App.5th at pp. 1124-1125.)

II. *Reasonable Efforts*

Mother contends the juvenile court erred because it improperly focused on the degree of her progress to determine whether her efforts were reasonable. Not so.

The juvenile court articulated the proper legal standard several times during the disposition hearing. It explained the reasonable efforts were not synonymous with a cure and explained while the degree of progress is not the focus of a court's inquiry, a court may consider a parent's progress both in the short and long term. It then determined that while Mother made some efforts in terms of attending PEP classes and counseling, considering the totality of where she was after having engaged in services off and on since 2008, it was not reasonable.

Of utmost concern to the court was Mother's inability to understand or take responsibility for the reasons why her older children were initially detained. Specifically, she continued to minimize and justify physical discipline against G.P. Furthermore, Mother did not acknowledge the incident with Father constituted domestic violence, even though multiple witnesses observed him pushing Mother and hitting her in her stomach. We are cognizant "[o]ne cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 [affirming denial of reunification services].) A parent's continued denial of and failure to understand the reasons for the child's detention or take responsibility is a valid basis for finding both that a parent has not progressed in alleviating the problem that brought the child into dependency and return would be detrimental. Such denial over time can indicate the parent is neither cooperating nor availing herself of the services provided. (*In re Jessica B.* (1989) 207 Cal.App.3d 504, 516-517.)

As to physical discipline of the children, Mother explained her physical abuse of G.P. was because she could not handle his behavior. When testifying, Mother

11

blamed G.P. for misbehaving. Mother testified she had only ever hit G.P. on the buttocks, had once accidentally hit him on the hand with a mop handle because he moved his hand, and had never hit him in the face. The day he was taken into protective custody, he threw a tantrum when she tried to get him up for school. She said she only hit him on the leg with her hand. She did not know how he got the bloody nose or swollen eye or scratch on his face. Mother testified the only child she really needed services for was G.P. due to his behavioral problems. Vargas testified Mother admitted she had physically abused G.P. because of his behaviors, and seemed to blame G.P. With this evidence, the juvenile court properly reasoned Mother still did not understand what she did wrong, and failed to accept she had caused G.P.'s injuries; thus her efforts showed a lack of progress and were not reasonable.

As to domestic violence, Mother denied that while she was pregnant, Father ever pushed her to the ground, slapped her face, hit her in the stomach, ripped her dress during an argument, or said bad words to her. At most, she acknowledged Father had yelled at her twice. The juvenile court determined otherwise. The court believed the multiple witnesses that described Father physically assaulting Mother in September 2019, rather than Mother's denials. "[W]e do not make credibility determinations or reweigh the evidence. [Citation.]" (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1121.) The court properly determined that although Mother had attended services, she failed to implement what she learned from those services, continuing to minimize and/or change her explanations about domestic violence with Father.

In sum, the juvenile court determined Mother did not demonstrate insight from her services to make a meaningful change, as evidenced by Mother's lack of forthcoming testimony in terms of disciplining children and domestic violence. The court properly considered Mother's progress by both her short- and long-term efforts. In 2020, she was still addressing the same, or substantially the same issues, that brought her older children into dependency proceedings more than a decade earlier. When

12

questioned at the hearing as to what services she would need to teach her something she had not already learned, in services provided to her almost continually since 2008, she replied, "the class to teach me how to go with the children for their behavior." At this point in the case, it is hard to imagine what additional services would help Mother reach this goal.

Despite Mother's recent re-enrollment in counseling and PEP, the court reasoned her lack of understanding and denial of her problems continued the risk she would recreate the conditions endangering J.Q. Substantial evidence supports the juvenile court's determination applying the bypass provision and denying Mother reunification services.

III. *Best Interests*

Mother contends the juvenile court abused its discretion when it determined it was not in J.Q.'s best interest to provide her with reunification services. We find no such abuse of discretion.

"'[T]o determine whether reunification is in the child's best interest, the court considers the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity.' [Citations.]" (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1124.) "Of paramount concern in the determination of a child's best interest, after it is determined that reunification is no longer necessarily the objective, is the child's need for stability and continuity. [Citation.]" (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 67.)

The juvenile court properly weighed these factors in reaching its best interest decision. It determined Mother did not make a reasonable effort to treat the underlying reasons for the children's removal. Her problems were longstanding and persistent. They also recurred despite her receiving services for them since 2008. By applying the bypass provision, the court indicated its concern Mother could again revert

13

to the same behavior and endanger the child, and further services would be fruitless.  We find no error with the court's decision.[3]

DISPOSITION

The petition is denied.

O'LEARY, P. J.

WE CONCUR:

ARONSON, J.

GOETHALS, J.

---

[3] Mother argues, for the first time on appeal, SSA did not make reasonable efforts to prevent or eliminate the need for removal.  Assuming this issue is properly before us, SSA offered a plethora of services at or even before detention, including counseling, a PEP, a child abuse program, and parent mentoring.  Mother does not argue these services were insufficient.  On the contrary, she argued these services enabled her to make so much progress the child should be returned to her.  We find no error.

14